## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-101-ABJ** |
| **JAY MATTHEW KENYON** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jay Matthew Kenyon to 48 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and a mandatory assessment of $170.

To be sure, a sentence of 48 months of incarceration represents a significant upward departure or variance from the top of the guidelines as calculated by the government (that is, 18 to 24 months). Such a departure or variance, however, is both warranted and necessitated by Kenyon's preparations for physical violence on January 6 coupled with his bellicose social media statements encouraging others to do the same; the egregious and protracted nature of his conduct on January 6 at the U.S. Capitol; the mendacity and shocking lack of remorse Kenyon displayed while testifying at trial; and, significantly, his deliberate targeting of the peaceful transfer of power.

## INTRODUCTION

Defendant Jay Matthew Kenyon participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral

1

College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] After months of working out in preparation for the anticipated violence of the day, Kenyon arrived at the U.S. Capitol wearing body armor. Time and time again while on the Capitol grounds and within the building itself, Kenyon ignored obvious signs that his presence was unauthorized and actively engaged in disruptive conduct that exacerbated the chaos. On at least three separate occasions, Kenyon intentionally interfered with and obstructed the efforts of the U.S. Capitol police ("USCP") and Metropolitan Police Department ("MPD") officers attempting first to keep Kenyon from entering the Capitol and then to get him to leave. Indeed, even after being held at gunpoint by police officers attempting to evacuate members and staff, Kenyon refused to leave. Throughout his time at the Capitol, Kenyon remained undeterred, convinced that he was "part of the revolution" Tr. Ex. 612, and that it was time to "march on and occupy each corrupt legislative body and bureaucracy from the local to the state en masse." Tr. Ex. 607A. He understood that Congress was meeting in a Joint Session on January 6, 2021, to conduct the certification of the electoral college vote count and intended to delay that certification. 3/12/2024 Trial Tr. at 311:13-312:3, 365:14-366:2. At trial, Kenyon elected to testify and repeatedly lied about his

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

reasons for being at the Capitol that day. He has yet to express any remorse for his conduct. After the close of evidence but prior to the Court's verdict, the government dismissed Count Two (charging Kenyon with violating 18 U.S.C. § 1512(c)(2)) in light of the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024). Nonetheless, the facts established at trial warrant a sentence that fully addresses the entire scope of Kenyon's conduct and deters future violations, while crediting the undeniably difficult circumstances of Kenyon's childhood. Accordingly, the government recommends that the Court sentence Kenyon to 48 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and a mandatory assessment of $170.

## I.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the affidavit in support of a criminal complaint filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Kenyon's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Social Media Posts*

Between the Presidential Election on November 3, 2020 and January 6, 2021, Kenyon made a number of public posts on social media and sent messages in private communications reflecting (1) his belief that the presidential election was fraudulent; (2) his awareness of the certification process; and (3) his intent to stop or delay that process.

3

In November 2020, Kenyon attended a rally in D.C. to support then-President Trump. *See,*

*e.g.*, Tr. Ex. 630 (stating that the first protest he participated in was the "Stop the Steal Rally" on

November 14, 2020). On November 15, 2020 (and less than two weeks after election) Kenyon

posted on Facebook about his experience, opining that, "America Needs to Fucking Wake up! . . .

Anyone left that still doesn't understand what is happening, you need to understand this is LEGIT

1776." Ex. 601. He concluded that same post with the promise of additional violence to come,

bragging that, "I will fight. We are ready. I'm not the only one who has been hitting the gym for

months now . . . That was purposeful and definitely less about my overall physical health." *Id.*



**Jay Kenyon**
Nov 15, 2020 ·

America Needs to Fucking Wake up! This all happened because we are conservative and elites need to destroy us as we are the only thing standing between them and tyranny. This is PANTIFA. Bunch of worthless tools. They were corraled, surrounded by 100k MAGA and police and a barricade. Fun fact, the Capital Police had there backs turned to 100k MAGA the entire time. The dispersed before sunset. I left right before they attacked. They waited. I walked right past three and they didn't say boo. Then attacked old people, women and children. Anyone left that still doesn't understand what is happening, you need to understand this is LEGIT 1776. When the RNC allows Alex Jones give a speech to 100k people, you best listen. This is how it began in Germany. Single out a group, normalize violence against us, make us subhuman (Bigots, Racist, Misogynists) and then round us up when we dont comply with increased COVID restrictions. We are going to patiently wait. But our patience is running thin. I will fight. We are ready. I'm not the only one who been hitting the gym for months now.... That was purposeful and definitely less about my overall physical health.

*Image 1: Kenyon's November 15, 2020 Facebook Status Update (Tr. Ex. 601)*

Two weeks later, on December 4, 2020, Kenyon sent a Facebook message echoing the

same violent rhetoric: "Citizens can arrest the Governor Legally I been working out for a reason.

I knew what was coming. . . Im more concerned about carrying gear and my kit if necessary. It's 70 ish lbs. Plus the rifle and side arm. I was not in shape for that I am now . . ." Tr. Ex. 603A and 603B. Later that same day, Kenyon lamented with the lack of support for his plan: "Ppl gotta be activated. Numbers man. If I had the numbers I could pull this off. Govt cannot function when citizen refuse to participate. And then we establish our own." Tr. Ex. 603C. Days later, on December 8, 2020, Kenyon explicitly threatened the peaceful transfer of power: "We do not need martial law. We only need pitch forks and millions of Patriots. We occupy all Government Corruption Centers, accept all resignations, create autonomy zone in corrupt cities, as well as , autonomy zones at the state capitals. Accept all resignations of corrupt politicians and buerocrats. Install interim government." Tr. Ex. 605.



THE GREAT AMERICAN RESET: by Jay Kenyon, Patriot, USA. Taxation without representation any tyranny were two of the main issues initiating 1776. In 2020, tyranny came in the form of Covid-D weaponized against the world, not to kill, but to trigger a great reset. November 4, 2020 National Election Without Representation Solution: Great American Reset We do not need martial law. We only need pitch forks and millions of Patriots. We occupy all Government Corruption Centers, accept all resignations, create autonomy zone in corrupt cities, as well as , autonomy zones at the state capitals. Accept all resignations of corrupt politicians and buerocrats. Install interim government. Hold open elections in six months. Done. Not a single shot fired. Coordinate, activate, pick a date, LET's ROLL, said TODD BEMER super patriot. NOT MILITARY NOR LEO will do anything. Patriots in 1776 did it. January 20, 2021 will be our new Independence Day. Georgia does not matter. Trump can handle the Federal Government. It is our job to clean up the states and finally LEGITIMIZE our GREAT PRESIDENT. Nothing to stop our numbers. Like and share everywhere. PS. THIS IS ALSO why Georgia don't matter.

*Image 2: Kenyon's December 8, 2020 Facebook Post (Tr. Ex. 605)*

Kenyon soon began to focus on January 6, 2021 as his preferred date to take action, *see* Trial Exhibits 610 and 612 below, and boasted that he was continuing to exercise to be physically stronger and heavier by January 6. Tr. Ex. 613 ("This torn muscle two weeks to heal, but I'm back at it. Need 15 lbs more weight by January 6 And You Damn right if you think Im going FULL ON PATRIOT! I AM RADICALIZED!").



*Image 3: Kenyon's December 19, 2020 Facebook Status Update (Tr. Ex. 610)*



**Jay Kenyon**
Dec 20, 2020 •

Trump: "January 6, 2021 Washington DC Be There, Will Be Wild" Be part of the revolution. It's gonna be fun!

*Image 4: Kenyon's December 20, 2020 Facebook Status Update (Tr. Ex. 612)*



**Jay Kenyon**
Dec 21, 2020 •

This torn muscle two weeks to heal, but I'm back at it. Need 15 lbs more weight by January 6 And You DAMN right if you think Im going FULL ON PATRIOT! I AM RADICALIZED!I think we have always been Radicalized, it was just Dormant for sometime. I do this for my kids, grandkids etc. And I give no fucks what anyone thinks. Fight for Trump. Fight for America or Shut the Hell Up and go back to your basement. People in the Valley need to get radicaluzed. This Fight Will Be here in weeks. Virginia will not go with the Biden succession. And yes.. that will be what happens Jan 20 when Trump is inaugurated.

*Image 5: Kenyon's December 21, 2020 Facebook Status Update (Tr. Ex. 613)*

Kenyon continued to exhort others to follow his call and embrace the need for violence to keep Joe Biden from becoming president, writing on December 21, 2020: "Be afraid, get Radicalized! Be a Patriot. Don't let them take our way of life. *It is worth dying over. Nothing has ever been more worth dying over.*" Tr. Ex. 614 (emphasis added). For good measure, Kenyon posted a photograph of himself in workout attire on January 1, 2021, promising to be ready for January 6:



*Image 6: Kenyon's January 1, 2021 Facebook Status Update (Tr. Ex. 619)*

8

***Kenyon's Participation in the January 6, 2021 Capitol Riot***

The night before January 6, 2021, Kenyon drove from his home in Virginia to Washington, D.C.    The next morning, Kenyon attended the Stop the Steal rally at the Ellipse before making his way to the Capitol Building.    Kenyon approached the Capitol from the West Front where officers were attempting to form a line to keep rioters from gaining access to entrances on the Upper West Terrace.    Kenyon was among the rioters who ignored police commands; indeed, video evidence shows Kenyon screamed and gestured at police officers standing between the mob and the Upper West Terrace door.



*Image 7: Kenyon Following and Yelling at Retreating Police Line (Tr. Ex. 304).*

Eventually, the growing mass of rioters overwhelmed and pushed back the police with their greater numbers.

9

Capitol Closed Circuit Video ("CCV") footage from January 6 shows that Kenyon entered the Capitol at approximately 2:36 p.m. through the Upper West Terrace Door—the same door where he had previously confronted police officers.   The door alarm blared loudly, but Kenyon nonetheless proceeded inside of the building. Tr. Ex. 302. He climbed the steps to the second floor, entering the Rotunda. While inside, Kenyon posted a Facebook live video filming himself inside the Capitol wearing a plate carrier vest. Soon thereafter, he exited the Rotunda into Statuary Hall and then into the House wing of the Capitol. At approximately 2:44 p.m., Kenyon joined a crowd of rioters outside of the House chamber as the crowd pushed against the doors of the chamber while chanting "USA! USA! USA!" Tr. Ex. 303. Kenyon walked towards the Speaker's Lobby behind the House Chamber before ascending stairs leading to the third floor just outside of the House Gallery. Tr. Ex. 107-110.

At that time, House members were sheltering in place inside the Gallery because United States Capitol Police ("USCP") were unable to evacuate them.   At approximately 2:48 p.m., Kenyon entered the House Appropriations Committee Office on the third floor, a room connected to the corridors surrounding the House Gallery.   Within minutes, USCP officers on the third floor drew their firearms and directed rioters in the corridors surrounding the House Gallery to lie on the ground so that House Members could safely evacuate.   Members of the USCP Containment Emergency Response Team entered the Appropriations office (where Kenyon was at that time) and held Kenyon and other rioters on the floor there until Members evacuated.   At approximately 3:00 p.m., USCP escorted Kenyon from the third floor, his hands raised above his head, to the gallery stairs that led to an exit from the Capitol. Tr. Ex. 110B, 113.

10



*Image 8: Law Enforcement Escorting Kenyon from Third Floor (Tr. Ex. 110B)*

After descending the stairs, Kenyon walked past the open doors leading to the East side of the Capitol and instead re-entered the Rotunda. Tr. Ex. 114.

Shortly thereafter, a significant contingent of USCP and MPD officers arrived to clear the Rotunda.   Officers formed a line that began to push the rioters, including Kenyon, towards the exit. Tr. Ex. 116.1. During that effort to contain the rioters, Kenyon physically pushed against officers and again refused to leave. Tr. Ex. 201-02.



*Image 9: Kenyon Resisting Police Efforts to Clear the Rotunda (Tr. Ex. 202)*

At approximately 3:16 p.m., officers pulled Kenyon from the scrum and supervised Kenyon while he sat on the floor, in part because officers believed he had brandished a pocketknife. Tr. Ex. 204.1. At approximately 3:25 p.m., an MPD officer escorted Kenyon from the Rotunda to the Memorial doors on the first floor, where he exited the Capitol at approximately 3:26 p.m. Tr. Ex. 117-18.

### Kenyon's Statements After January 6

Kenyon continued to post prolifically on social media after leaving the Capitol on January 6. He boasted about his role in the breach of the Capitol building and demonstrated no remorse for his part in the riot: "I have no fear because I know what I did, I know what happened, and I will accept my consequences," "I followed through with what I said. We demonstrated what happens

when citizens immediately withdraw consent and confidence. . . Can you imagine how easy the local level will be? They don't have our fight," and ". . . I'm just getting started. No fear. I am all in. 110. I welcome the FBI to my house. I don't answer questions." Tr. Ex. 634.



*Image 10: Kenyon's Facebook Status Update (Tr. Ex. 634)*

Despite his active participation in the riot and obstructing officers at the Capitol, Kenyon continued to insist that he and other rioters were, at most, trespassing, and that police had actually set rioters up. For example, on January 7, 2021, Kenyon commented on Facebook that January 6 "was [sic] total set up. I saw it all. They let us in and then attacked. . . The best they can charge anyone is trespassing [sic]. These people went inside and everyone walking around like it's the Smithsonian. I guess if I gotta go to jail, then so be it. I knew that was a consequence." Tr. Ex.

621. On January 8, 2021, Kenyon insisted it was the combined efforts of Antifa and the police that resulted in the destruction: "Any destruction was the initial surge of ANTIFA members who posed like Trump supporters. Capitol police removed barriers and waved us in. They stood down and we were all just chilling in the Capitol." Tr. Ex. 627C.

In private text messages, however, Kenyon acknowledged that his entry into the Capitol was intentional. For example, on March 6, 2021, Kenyon wrote, "But I knew I had to go in. I didn't just bumble in like alot did. I knew shit was off. It was too organized and not just organic. Alot of it, I can look back and see. I knew it had to have started before the speech was over. We all heard that they were taking over Capitol not long after we started waking and I started hoofing it to get there." Tr. Ex. 503 at 5. He then added, "I am absolutely proud of myself" and "I also know I am on the right side of history and what I did that day will really mean something at some point when the actual plan, whatever it is, reveals itself. *Id.* at 9.

Kenyon also created an online fundraising campaign to raise money based on his January 6 conduct. His account, title "January 6 Legal Defense Fund for Jay Kenyon" on the "givesendgo.com" website, included a description of his reason for going to Washington, D.C. on January 6, 2021; namely, that he was "there to support a 15-day delay in the certification to allow for an audit of the battleground states." Tr. Ex. 630. Elsewhere on his campaign page, he continued to insist that his conduct on January 6 was "ACTUALLY peacefully protesting," and that he had "truths that will prove this was set up." *Id.*

### *Kenyon's Testimony at Trial*

At trial, Kenyon exercised his right to testify in his own defense. During his testimony he

made the following admissions:

- He knew that Congress was meeting in a Joint Session on January 6, 2021 to conduct the certification of the electoral college vote count and his intent was to delay the certification. *E.g.*, 3/12/2024 Trial Tr. at 311:13-312:3, 365:14-366:2.

- He first attended the Stop the Steal rally at the Ellipse, *id.* at 314, and stayed until after then-President Donald Trump spoke to the crowd, *id.* at 319:19-22.

- He wore a 50-lb plate carrier vest while he was at the Capitol, which was capable of stopping rifle rounds.  *Id.* at 314:23-315:1.

- He wrote posts on social media calling for a 1776-style event and cataloguing his own physical fitness in preparation for such an event.  *E.g.*, 361-62.

    Kenyon also made the following materially false statements in the course of his testimony.

For example, he claimed:

- He only went to the Capitol to hear then President Donald Trump speak.  *Id.* at 324-25.

- He did not see bike barricades, snow fencing, or fighting with police on the West front. *Id.* at 325, 329:19-25.

- He believed he was permitted to go into the Capitol Building despite hearing alarms and witnessing the use of tear gas and OC spray.  *Id.* at 330:17-331:6.

- It was peaceful when he was inside the Capitol Building and people were being respectful.  *Id.* at 334:14-19.

- He did not push against the police line in the Rotunda. *Id.* at 351:22-352:4.

- When he wrote on social media that rioters had "taken" or "breached" the Capitol, he only meant they had walked inside.  *Id.* 391-92, 394.

When issuing its verdict, the Court referenced at least two specific assertions that it found not credible. *See, e.g.*, 10/15/2024 Trial Tr. at 14:25-15:6 ("His trial testimony that all his references to 1776 were just meaningless, that was just a term he was throwing around, as opposed to a cry to revolt, was not credible and, frankly, it was nonsensical. 1776 was in fact a revolution against

tyranny, and that is exactly why the rhetoric surrounding January 6, including the defendant's, was full of references to it."); *see also* Trial Tr. at 15:20-22 ("And he testified, well, the only thing that impeded forward movement on my way into the Capitol was other protestors. To which I have to say: Really?").

### Kenyon's Public Social Media Statements Since Trial

Since his trial and conviction, Kenyon's lack of remorse is manifest in his insistence that he was a victim of the events of January 6, rather than one of the perpetrators of a violent attempt to prevent the routine post-election transfer of power. For example, on November 29, 2024, Kenyon posted on his X account (J6Jay @ Real_BasedAF) that January 6 was a "set up": "If you take the pardon everything ends there. You are forever a forgiven felon. If it's proven (as we all believe) that #J6 was a set up and you accepted pardon, you can't go through a judicial process to be exonerated."

16



*Image 11: Kenyon's X Post on Nov. 29, 2024*

More recently, Kenyon (pictured below in Image 12, above his X user name @Real_BasedAF)

participated in New Year's Eve conversation about January 6 that he described as "[p]utting

emphasis on one of the greatest American injustices in the entire history of a [sic] America."



*Image 12: Kenyon's X Post on Dec. 28, 2024*

## II.    THE CHARGES AND BENCH TRIAL

On March 29, 2023, a federal grand jury returned an Indictment charging Jay Matthew

Kenyon with six counts, including, 18 U.S.C. § 231(a)(3) [civil disorder], 18 U.S.C. § 1752(a)(1) [entering and remaining in a restricted building or grounds]; 18 U.S.C. § 1752(a)(2) [disorderly and disruptive conduct in a restricted building or grounds]; 40 U.S.C. § 5104(e)(2)(D) [disorderly conduct in a Capitol building]; and 40 U.S.C. § 5104(e)(2)(G) [parading, demonstrating, or picketing in a Capitol building]. The Indictment also charged Kenyon with violating 18 U.S.C. § 1512(c)(2), but as described above, the government dismissed Count Two prior to the Court's verdict. On October 1, 2024, Kenyon was convicted of each of the five remaining offenses following a bench trial.

## III.    STATUTORY PENALTIES

Kenyon now faces sentencing on the five charges of conviction set forth above. The Presentence Report identifies the maximum penalties for each of those offenses. See PSR ¶¶ 100-104 (custodial terms), 108-109 (supervised release), and 126-131 (fines and special assessments).

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Sentencing Guidelines Calculation

The government submits that the Guidelines analysis for each of the counts for which Kenyon was found guilty are as follows.

   a.  *Count One: Civil Disorder, 18 U.S.C. § 231(a)(3)*

| | |
|---|---|
| Base offense level: U.S.S.G. § 2A2.4(a): | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A): | +3 |
| Obstruction: U.S.S.G. § 3C1.1(a): | +2 |
| | **Total Offense Level: 15** |

   b.  *Count Three: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)*

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2B2.3(a) | 4 |
| Restricted Grounds: U.S.S.G. § 2B2.3(b)(1)(vii): | +2 |
| U.S.S.G. § 2B2.3(c)(1) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2X1.1(a) | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A): | +3 |
| Obstruction: U.S.S.G. § 3C1.1(a): | +2 |
| | **Total offense level: 15** |

   c.  *Count Four: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2)*

| | |
|---|---|
| Base offense level: U.S.S.G. § 2A2.4(a): | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A): | +3 |
| Obstruction: U.S.S.G. § 3C1.1(a): | +2 |
| | **Total Offense Level: 15** |

   d.  *Count Five: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D)*
Because this is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. 3559; U.S.S.G. § 1B1.9.

   e.  *Count Six: Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. § 5104(e)(2)(F)*
Because this is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. 3559; U.S.S.G. § 1B1.9.

B.  <u>Grouping</u>

Under U.S.S.G. §3D1.2, "closely related counts" group.  Here, Group One consists of Count One because the victim is law enforcement.   Group two consists of Counts Three and Four

group because both involve the same victim (Congress). See U.S.S.G. § 3D1.2(a). Here, however, Groups One and Two group together pursuant to U.S.S.G. § 3D1.2(c) ("When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"). Accordingly, the combined offense level is **15**.

    C. <u>Applicable Adjustments</u>

        The government concurs with the calculations of the PSR, and the defendant has not raised any objections regarding the guidelines calculations. First, Kenyon has not demonstrated acceptance of responsibility and therefore does not receive any reduction pursuant U.S.S.G. § 3E1.1(a) or (b). PSR ¶ 54. Second, the three-point enhancement pursuant to U.S.S.G. §2A2.4(b)(1) applies here because Kenyon's offense conduct involved physical contact with police officers. In particular, as described above, while confronting the police officers attempting to clear the Rotunda, Kenyon physically pushed back against officers in resisting their efforts to remove him from the Rotunda. During that time, he made additional physical contact with officers, including pulling up one officer's mask. PSR ¶ 48. Third, the two-point enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice applies because Kenyon attempted to obstruct and impede the administration of justice at trial by "committing, suborning, or attempting to suborn perjury . . ." and "providing materially false information to a judge or a magistrate judge." U.S.S.G. §3C1.1, cmt., n4(B) and (F). As described above, Kenyon elected to testify under oath at his trial in his own defense, and in doing so, made a number of material false statements. PSR ¶ 51.

Finally, Kenyon is not entitled to any reduction pursuant to U.S.S.G. § 4C1.1 because he used violence or the credible threat of violence in connection with his offense conduct.[2] PSR ¶ 55. Once again, Kenyon does not object or contend otherwise. As this Court is aware, while U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria, it does not apply where the defendant used violence and/or credible threats of violence against people or property under a totality of the circumstances. Here, it is undisputed that after being held at gunpoint—which alone demonstrates that Kenyon posed a "credible threat of violence"—and escorted to an exit, Kenyon walked past the exit to re-enter the Rotunda. Once there, Kenyon confronted officers who had formed a line to push rioters out of the building, and physically pushed against them and pulled up one officer's gas mask. As a result of his conduct and the officers' belief at the time that he had brandished a pocketknife, Kenyon was pulled through the police line and was separated from the mob and supervised until an officer was available to remove him from the building.

---

[2] Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that, even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history. Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 59. Accordingly, based on the government's calculation of Kenyon's total adjusted offense level, after acceptance of responsibility, at 15, Kenyon's Guidelines imprisonment range is 18 to 24 months' imprisonment. The USPO's draft PSR contains a Guidelines range calculation that mirrors the calculation described above.

 D.  <u>Departures/Variances</u>

After determining the defendant's Guidelines range, a court considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Kenyon's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

As proved at trial, Kenyon was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Kenyon "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United*

*States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Defendant would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[3] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. Thus, a sentence within Kenyon's Guidelines range would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the

---

[3] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *Fischer v. United States*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

appropriate punishment for the offense. U.S.S.G. § 5K2.7.[4]  In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this District have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As one judge explained,

> He just wanted to delay the certification. He wanted the election certification stopped. That's chilling to me. I mean, that is not a minor thing, in that through -- through acts of violence and intimidation, we're going to stop the most sacred day in our democracy from occurring, which is the certification of the election, because we want some more time to try and make our case because the dozens and dozens of courts that have considered the issue and have concluded there was not a problem with the election weren't enough, and because I want someone else to take another look at this. And so, therefore, I'm going to go down to the Capitol and I'm

---

[4]  This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

> going to stop the certification of the election from occurring. So I
> think that the offense here, to my mind, is one of enormous gravity.

*United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44. And as another judge explained,

> The security breach forced lawmakers to hide inside the House
> gallery until they could be evacuated to undisclosed locations. In
> short, the rioters' actions threatened the peaceful transfer of power,
> a direct attack on our nation's democracy.

*United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

And this Court has joined several others who have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

26

In *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. However, prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. Judge Kelly found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. Judge Kelly found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, Judge Kelly found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a

defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, Judge Cooper determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But Judge Cooper also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. That court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2. From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

More recently, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a

defendant convicted under §§ 111(a)(1), 231(a)(3), and four misdemeanors, after his § 1512(c)(2)

conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was

warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because:

> [A]fter *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none
> of the conduct that goes into determining defendant's sentencing guidelines reflect
> his intent to engage in political violence that poses such a threat to our American
> democracy…   His intent to obstruct Congress in the Electoral College certification
> by violence, if necessary, go above and beyond what any of his current convictions
> now take into account.

*Oliveras*, 21-cr-738 (BAH), Sent. Tr. at p. 49. The court noted that "[i]n assessing the extent of

the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G.

§] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide… [and] an upward

departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would

impose the same sentence with . . . an upward variance for the same reasons that are outlined in

§ 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range

of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of Kenyon's crimes is not adequately captured by the applicable

Guidelines, an upward departure is appropriate here as well. If the Court declines to depart, an

upward variance is warranted. An upward variance is appropriate when "the defendant's conduct

was more harmful or egregious than the typical case represented by the relevant Sentencing

Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range,

"*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the

Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To

reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Kenyon repeatedly sought to trivialize the breach of the U.S. Capitol and the rioters' efforts to stop the peaceful transfer of power on January 6 as mere trespassing. *See, e.g.*, Tr. Ex. 621 ("The best they can charge anyone is trespassing."); and Tr. Ex. 622 ("Unless you broke shit or assaulted someone, it's misdemeanor trespassing. Btw . . . No on broke shit or assaulted anyone."). This is simply false. Indeed, in past sentencings, this Court has made clear its view that January 6 was no mere political protest or trespass in a federal building. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America

America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. Those powerful words aptly and appropriately recognized the seriousness and unprecedented nature of the riot at the U.S. Capitol on January 6.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[5]

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See, e.g.*, *United States v. Reffitt*, 21-CR-32-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th

---

[5] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[6]

In this case, the government submits that an upward variance or departure of 24 months is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received sentences of around 48 months. Furthermore, there can be no serious question that the Sentencing Guidelines for violations 18 U.S.C. §§ 231, 1752(a)(1), and 1752(a)(2) fail to capture the seriousness of Kenyon's conduct. A significant upward departure or variance is necessary to address the criminal conduct for which he has been convicted.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

---

[6] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

As shown above, Kenyon's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Kenyon came to the U.S. Capitol intending to use physical force to delay the certification, an intent he spelled out explicitly and repeatedly in his social media posts before and after January 6. He came to the Capitol wearing body armor in anticipation of violence, and largely kept his face covered with a mask. Once inside, he joined the mob outside of the House Chamber, prowled the hallways outside of the House galleries where members of Congress awaited evacuation, and entered the Appropriations room where he was held at gunpoint. He was marched to the nearest exit with his hands up, but even after that, refused to leave and instead entered the Rotunda and further obstructed and impeded officers attempting to clear the rioters from the building. His conduct was so disruptive that he was pulled through the police line, once again, escorted to an exit. The nature and circumstances of Kenyon's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 48 months.

### B.  The History and Characteristics of the Defendant

Kenyon experienced an unquestionably difficult and traumatic childhood. PSR ¶¶ 65-68. Nonetheless, there is evidence that he overcame those issues to live a productive life. Kenyon graduated from high school in 1995, obtained a Bachelor of Science degree in psychology, and obtained his Master's Degree in Public Administration from James Madison University. PSR ¶ 85. Since 2000, Kenyon has been a qualified mental health professional and has worked for various health services providers as counselor, case worker, or more recently, a regional supervisor. PSR

¶¶ 87-88. He remains employed. *Id.* Kenyon is married and lives in Virginia with his wife and daughters. PSR ¶ 72. He has a history of alcohol abuse, including what he reports was a near fatal accident while intoxicated, but has been sober since 2018—three years before January 6, 2021. PSR ¶ 81. And while he previously had a medical marijuana card, he chose to give it up because it prohibited him from having a firearm. PSR ¶ 82. In short, despite the tragic circumstances of his early childhood and his subsequent history of alcohol abuse, Kenyon obtained a high level of education, found meaningful and important work as a counselor, and created a stable home situation. Despite the advantages of education, steady employment, and a supportive family, Kenyon put on body armor and went to Washington, D.C., to "[b]e part of the revolution," Tr. Ex. 612, unlawfully entered the U.S. Capitol, and refused to leave even after being held at gunpoint by Capitol police officers. If anything, such factors highlight that Kenyon had choices other than to engage in violent criminal conduct on January 6. Indeed, as his statements on social media and at trial made clear, his education meant that he fully understood the consequences of breaching the U.S. Capitol on January 6—but he chose to do so anyway. Accordingly, Kenyon's history and characteristics support a period of incarceration above his guidelines sentencing range.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Kenyon's criminal conduct on January 6 was the epitome of disrespect for the law. Prior to January 6, Kenyon repeatedly expressed his willingness to take the law into his own hands to achieve his preferred political outcome of stopping or delaying the Electoral College certification. *See, e.g.*, Tr. Ex. 602 ("This hearing is lit and no way they sending their electors");

Tr. Ex. 605 ("We only need pitch folks and millions of Patriots"); Tr. Ex. 607A ("This problem can be solved with pitch forks and numbers without one shot fired"); Tr. Ex. 612 ("Be part of the revolution. It's gonna be fun!"); and Tr. Ex. 630 ("We were there to support a 15-day delay in the certification to allow for an audit of the battleground states."). He came to the Capitol after purposefully working out at the gym, wearing body armor and a mask, and physically confronted and obstructed officers trying to get him to leave the building. Tr. Ex. 503 ("I literally held back a three cops stacked up in riot gear. Ripped up the mask of the one in front of me so he could hear me yelling at him to stop."). Kenyon announced his intent to use violence, came to the Capitol prepared to use violence, and then took actions that would in fact obstruct the Certification. "Where a defendant announces his intent to use violence to obstruct a congressional proceeding, comes equipped for violence, and then actually obstructs that proceeding, the evidence supports a finding that he acted with an impermissible purpose or knowledge of the wrongfulness of his actions." *United States v. Brock*, 94 F.4th 39, 50 (D.C. Cir. 2024). Here, such evidence demonstrates Kenyon's complete disregard for the rule of law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Kenyon's conduct on at the Capitol tracked what he had been saying on social media for weeks prior to January 6—that he was ready and willing to embrace the use of violence and physical force as a solution to his political grievances. In his social media posts, he insisted that taking action to occupy and take control of legislative bodies was not only justified, but necessary. Tr. Ex. 607A ("The Great American Reset is a simple solution. This problem can be solved with pitch forks and numbers without one shot fired. Coordinate, activate, and pick a date to march on and occupy each corrupt legislative body and bureaucracy from the local to the state en masse."). True to his word, Kenyon went to the U.S. Capitol on January 6 and did his part to occupy the Capitol, even refusing to leave after being held at gunpoint by Capitol police. Since then, Kenyon has continued to post his view about January 6 on social media. Such postings are highly relevant to Kenyon's evasion of accountability for his conduct on January 6 and his shocking lack of any remorse. Kenyon's ongoing and persistent refusal to acknowledge any wrongdoing necessitates a lengthy sentence to deter Kenyon from similar conduct in the future. Further, whatever measure of remorse or contrition Kenyon may finally deem fit to express at sentencing, his social media statements (some very recent) serve as a reliable benchmark of his actual feelings concerning his criminal conduct. Accordingly, a significant period of incarceration is necessary as a deterrent to Kenyon from undertaking similar

actions the next time an election does not go to his preferred candidate.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The Guidelines Manual itself, however, explicitly recognizes that after calculating the appropriate Guidelines, the Court should also consider whether various departures are warranted under the particular circumstances of the case. U.S.S.G. § 1B1.1(b). For the reasons set forth above, an upward departure here is not only warranted but necessary to account for full scope of Kenyon's unlawful conduct, the circumstances of which are not otherwise accounted for in his calculated guidelines.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious,

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Even after the dismissal of the Section 1512(c)(2) charge, the Court can look to comparators to confirm that no unwarranted sentencing disparities would result from a sentence of 48 months here. Such individuals were all convicted of intentionally invading the Capitol on January 6 to disrupt the peaceful transfer of power. Whether or not it is independently criminalized under statute, the fact remains of primary significance in assessing their cases.

For example, in *United States v. Fonticoba*, 21-cr-638 (TJK), the defendant was sentenced to 48 months of incarceration for violations of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2), and Judge Kelly specifically noted that the Court would have imposed the same sentence even had Fonticoba

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

only been convicted of Section 231(a)(3). Fonticoba breached the Capitol grounds and building, helped destroy a black metal fence, and interfered with officers trying to stop the crowd's advance because he wanted to stop the Certification of the Electoral College vote. 21-cr-638, ECF. No. 57 at 2, 5-6, 9-11. Fonticoba, a member of the Proud Boys, marched to the Capitol and joined the group as they breached the West Front. Like Kenyon, Fonticoba had no criminal history, and like Kenyon, he publicly promoted false narratives about January 6 and celebrated his conduct there. Unlike Kenyon, who entered the Capitol and remained for almost an hour, Fonticoba entered the Capitol but left within minutes. Kenyon, unlike Fonticoba, actively skirmished with the police line working to clear the Rotunda.

Likewise, a sentence of 48 months would be less than similarly situated defendants who have been sentenced after the Supreme Court's decision in Fischer. *See supra* discussion of *Sparks* and *Robertson*. The government recognizes that this Court's sentence in *United States v. Garcia*, 21-cr-129 (ABJ) was for a period of incarceration of 12 months. In that case, however, Garcia's calculated guidelines range was lower than Kenyon's, reflecting the fact that Garcia—unlike Kenyon—was eligible for an acceptance of responsibility reduction and did not take the stand and testify falsely under oath. Furthermore, while Garcia left the Rotunda after officers began to corral rioters out through the Rotunda doors, Kenyon continued to resist efforts to clear the Rotunda and was ultimately pulled aside and separated from the rest of the riotous mob.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Here, Kenyon was convicted of violations of an offense under Title 18; accordingly, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar

41

covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Kenyon to pay $2,000 in restitution for his convictions on Counts One, Three, Four, Five, and Six. This amount fairly reflects Kenyon's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    FINE

The defendant's convictions for violations of 18 U.S.C. §§ 231, 1752(a)(1), and 1752(a)(2), and 40 U.S.C. 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $250,000 for Count One, $100,000 for Counts Three and Four, and $5,000 for Counts Five and Six. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense

to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $7,500 to $75,000 U.S.S.G. § 5E1.2(c). Kenyon did not provide verification of his finances. PSR ¶93.

Furthermore, as demonstrated at trial (*see* Tr. Ex. 630) and documented in the PSR, PSR ¶ 97, the defendant has engaged in fundraising. While it appears that personal his fundraising campaign had raised approximately $1,000, Kenyon has not demonstrated that the money will be used exclusively for paying legal bills.



I don't promote my own GiveSendGo as there is no point. The DOJ includes any received donations into our sentencing fine. I've collected 1k which is untouched and I will be cutting a check to @shipwreckedcrew in that amount. We'll, minus $200 I did use the first Christmas following #J6 because I was fired from my job 3 days following #J6 just because my employer knew I was there. Took me a year to find another.

Maybe post sentencing or release I might restart my GSS to help me get on my feet especially if new opportunities don't materialate.

Anyways, this post is about @shipwreckedcrew #j6 GOAT attorney. No one gets acquittal but he has a few times. It's money well donated.

Thank you.

*Image 13: Kenyon's X Post on Oct. 10, 2024*

Indeed, he has separately solicited donations for the GiveSendGo account titled "Shipwreckedcrew's January 6 Legal Defense Fund," which lists a goal of $500,000 and a balance of $268,788.00. PSR ¶ 97. Furthermore, Kenyon has stated in social media postings that he has no legal fees associated with this case.



*Image 14: Kenyon's X Post on Aug. 7, 2024*

Kenyon should not be able to use his own notoriety gained in the commission of his crimes to monetize his participation in the Capitol breach in this way.

45

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 48 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and a mandatory assessment of $170.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/ Craig Estes*
CRAIG ESTES
Assistant United States Attorney
United States Attorney's Office for the
District of Massachusetts (detailee)
Massachusetts Bar No. 670370
craig.estes@usdoj.gov
(617) 748-3100

*/s/ Sarah C. Martin*
SARAH C. MARTIN
Assistant U.S. Attorney
United States Attorney's Office for the
District of Columbia
Bar No. 1612989
Sarah.Martin@usdoj.gov
(202) 252-7048