**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-cr-101 ABJ** |
| | ) | |
| **JAY KENYON** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**DEFENDANT JAY KENYON'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

I.    <u>Introduction</u>

Comes now Defendant Jay Kenyon, by and through his undersigned counsel of record, William L. Shipley, and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on January 10, 2024.

Defendant Kenyon appears for sentencing before this Court having been convicted following a bench trial of the following crimes:

Count One: a violation of 18 U.S.C. Sec. 231(a)(3) - Civil Disorder;

Count Three: a violation of 18 U.S.C. Sec. 1752(a)(1) – Entering and remaining on restricted grounds without authorization;

Count Four: a violation of 18 U.S.C. Sec. 1752 – disorderly or disruptive conduct on restricted grounds;

Count Five: a violation of  40 USC 5104(e)(2)(D) -- Disorderly Conduct in a Capitol Building,

Count Six:  a violation of 40 USC § 5104(e)(2)(G) -- Parading, Demonstrating, or Picketing in a Capitol.

Count Two, a violation of 18 U.S.C. Sec. 1512(c)(2) was dismissed following the conclusion of the evidence but prior to the Court rendering its verdict.


II.    <u>Objections to the Offense Conduct Set Forth in the PSR</u>:

The Offense Conduct set forth in the PSR is largely consistent with evidence introduced at trial.

Paragraph 21 erroneously claims Mr. Kenyon "physically pushed against officers and refused to leave the building."   As the Court will recall, U.S. Capitol Police Captain Frederick Hopkins testified that at the time that this

2

episode happened, a "bottleneck" had developed at the east side doors leading out of the Rotunda. Video showed the foyer space between those doors and the Columbus Doors leading outside the Capitol was congested with persons waiting to leave through the Columbus doors while other persons were still entering through the same two doors. Captain Hopkins testified that his plan to move all the protesters out of the Rotunda and the building through the Columbus doors worked for the first 2/3 of the crowd, but the final 1/3 could not be pushed to Rotunda doors because of the bottleneck that resulted when the foyer was full. Mr. Kenyon was still in the Rotunda when this happened and was not able to move in the direction he was being pushed by the police because of the congestion between him and the east exit out of the Rotunda.

Paragraph 21 fails to note that when Mr. Kenyon was pulled out of the crowd in the Rotunda it was based on the <u>mistaken</u> belief by a Capitol Police Officer that Mr. Kenyon had possessed a knife. The Government conceded and the Officer testified that it was another individual – as shown by the video – who possessed the knife.

Paragraph 21 also states that Mr. Kenyon was "supervised" while sitting against the wall. That is not accurate – Mr. Kenyon sat against the wall unattended until an Officer approached, directed him to different exit out of the Rotunda, and then that Officer walked with him to that other set of doors where he exited. Captain Hopkins testified that he made the decision to make use of other exits out of the Rotunda after the bottleneck prevented the crowd from exiting out the east doors. Mr. Kenyon followed the instructions he was given after this decision was made and alternative exits were used.

Paragraph 25 claims that Mr. Kenyon made several false statements while testifying.  These allegations are not correct.

Mr. Kenyon first arrived at the Capitol after confrontations between police and protesters on the Lower West Front Plaza had ended.  The police had retreated into the Capitol through the Lower West Terrace tunnel when Mr. Kenyon reached the Upper Terrance Level.  The barriers and fencing that had been in place earlier in the day, used by the police earlier in attempting to control the crowd, were already dismantled and moved aside by the crowd before Mr. Kenyon arrived.

Mr. Kenyon entered the Capitol through the Upper West Terrace doors in the center of the building.  This was not a public entrance, there was a sign on the doors stating it was not an authorized entrance, a loud alarm was sounding at that location, and Mr. Kenyon did see a line of Officers further to the south that prevented the crowd from moving father in that direction.

BUT, at the same time, when Mr. Kenyon entered the building through these doors he walked past at least five uniformed Capitol Police Officers who had been blocking the crowd from entering.  Mr. Kenyon was in the line waiting to enter just outside the doors.  For reasons seemingly apparent but not explained by testimony, the five officers made a decision to stand aside and let the protesters in front of Mr. Kenyon into the Capitol.  Mr. Kenyon and the others in thet line outside followed.  Mr. Kenyon did not claim those officers "authorized" him to enter.  But his testimony that they allowed him to enter when they stood aside – whether reasonable or not under all the circumstances – is not a basis to find that he offered knowingly false material testimony by his

description of the events.  His belief was reinforced by the fact that protesters were leaving the building through that same hallway making it obvious that protesters were inside the building.

Whether it was "peaceful" inside the Capitol is a question based on location and relative impressions.  There was abundant video played during the trial that showed Mr. Kenyon walking around the inside of the Capitol with no scenes of violence or property destruction taking place.  Mr. Kenyon's testimony regarding it being "peaceful" inside the Capitol was not meant as a description of every moment he was inside.  The video is consistent with a view that many locations inside were free of any confrontation(s) between police and rioters inside.  At other locations the scene may have been more chaotic, and there were efforts by the police to prevent the rioters from going to specific locations, but there was no video offered where Mr. Kenyon was present that showed violence between police and protesters inside the Capitol.

The video evidence involving his confrontation with the police inside the Rotunda speaks for itself.  Mr. Kenyon's perception at the time, which was the basis for his testimony, was that he being pushed by the police line in a direction he was physically unable to go, and he only pushed back in response. The fact that he could not move in the direction he was being pushed was confirmed by the testimony of the Captain Hopkins about a bottleneck developing around 3:15 pm that frustrated his efforts to push everyone in the Rotunda out of the east exit doors.

Finally, the claim about what Mr. Kenyon meant by using the words "taken" or "breached" on social media in the days following January 6 is a matter of semantics, not intentionally false testimony.

Based on the above, Mr. Kenyon objects to the recommended +2 level enhancement for "obstruction."

III.    Guideline Calculation

The PSR does not recommend "acceptance of responsibility" based, in part, on the fact that Mr. Kenyon opted to take this matter to trial.  It should be noted, however, that Mr. Kenyon was charged with having violated 18 U.S.C. Sec. 1512(c)(2), and the only plea offer extended to him prior to the trial was that he plead guilty to the Sec. 1512 count and stipulate to guideline enhancements that would have resulted in a recommended guideline range of 41-51 months.  Mr. Kenyon's decision to go to trial was driven, in large part, by his unwillingness to enter into that specific plea agreement.

As the Court knows, the Government dropped the Sec. 1512(c)(2) count after *Fischer* and prior to this Court rendering its verdict.   While he might not be entitled to "acceptance" under the strict reading of the Guidelines, this fact should weigh into the Court's consideration of a downward variance as discussed further below.

Count One:  Civil Disorder

The applicable sentencing guideline is U.S.S.G.  Sec. 2A2.4.

Base Offense Level:                                                                            10

Physical Contact with an Officer                                          +3

Adjusted Offense Level**:**                                                **13**

Defendant Kenyon should receive a -2 level adjustment under U.S.S.G. Sec. 4C1.1 – "Zero Point" Offender.

The offense of conviction is not a "crime of violence."  Mr. Kenyon satisfies all the conditions for application of this adjustment, with the only issue being the use of violence or threatened use of violence.  To the extent there was physical contact between Mr. Kenyon and the officers it was incidental to the forceful efforts of the officers to push Mr. Kenyon and those near him in the direction of the east doors, combined with the limited physical space where this episode took place.

This view is supported by the fact that the Government did not seek to charge Mr. Kenyon with assault under Sec. 111(a) in connection with the episode inside the Rotunda, but only with obstructing/impeding/interfering with the officers under Sec. 231.

With the benefit of the additional -2 level reduction, the **Total Offense Level is 11**.  With a Criminal History Category of I, the Recommended Guideline Range is **8-14 months**.

IV.    Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), certain numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to the Defendants background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

> 1.  Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.
>
> a. <u>The Nature and Circumstances of the Offense</u>.

For the most part, the actions of the Defendant's on January 6 are not in dispute. As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) a relatively small group of malevolent actors who came to the Capitol with the intent to engage in violence for the purpose of disrupting the Congress's certification of the 2020 Electoral Vote count for the purpose of interfering with the peaceful transfer of Presidential power between Administrations.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with announced outcome of the election, but with no predetermined intention of engaging in violence. Many in this second group were drawn into acts of violence once at the Capitol as a result of what they observed and the way events unfolded; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

Mr. Kenyon's actions are on the border between the second and third groups, but the lack of any significant acts of violence directed at law enforcement push him in the direction of being in the third group notwithstanding his extended time he spent inside the Capitol.

His arrival came only after the most serious confrontations between police and protesters on the lower west Plaza area outside of Capitol had ended.  He wasn't aware of what had taken place over the more than 90 minutes between 1:00 pm and 2:30 pm Before he arrived.  While the scene on the Upper West Terrace might be characterized as chaotic, there was no violence between the police and protesters outside on the Upper West Terrance at 2:30 pm when Mr. Kenyon reached that location.  The crowd had entered the building approximately 15 minutes earlier through the Senate Wing Doors, and most police resources at that point were deployed to move Congress members and personnel to a safe location.  As the testimony showed, Officers inside the Capitol were limited to efforts at crowd management due to insufficient numbers.   A line of Officers did form across the Upper Terrace outside on the House end – the south end – to keep the protesters from going farther in that direction and around the south side of the Capitol.

Mr. Kenyon entered the Capitol through the Upper Terrance doors in the center of the building.  Those doors were first opened and became an access point when protesters inside the building were directed by police inside the building to exit through them.  This resulted in the doors being held open by

those outside, thereby allowing protesters outside to enter the Capitol. The five officers in question – as shown on the video -- emerged from inside the building to step protesters from entering, while still allowing protesters inside to exit through the doors. But with doors open and the crowd outside growing larger and demanding to be allowed to enter, the five officers relented, stood aside, and let the crowd pass – including Mr. Kenyon.

Mr. Kenyon's time inside the Capitol – prior to be caught up in the police efforts to push protesters out of the Rotunda – is largely uneventful. That is true even taking into consideration that the police suddenly drew firearms and ordered everyone onto the ground while he was in a third floor conference room. This happened in the immediate aftermath of the deadly shooting outside the Speaker's Lobby Entrance. Mr. Kenyon followed all directions given to him during that period, and he then he went back down to the Rotunda level.

The Court faulted Mr. Kenyon it its verdict by making a choice to turn left and enter the Rotunda rather than turn right and exit the Columbus doors when he reached the bottom of the starts at the Rotunda level. That decision – going left instead of right – led Mr. Kenyon into the circumstance approximately 10 minutes later from which he could not extricate himself once the police began pushing everyone inside the Rotunda towards the east exit.

b. <u>History and Personal Characteristics</u>.

The history and personal characteristics of Mr. Kenyon may be unlike any other defendant who has appeared before this Court in connection with the events of January 6. The nature and extent of the tragedies in his life likely

make him unique among all the defendants who have appeared before this
Court for sentencing over the past two plus decades.

The biographical information in the PSR accurately sets forth Mr.
Kenyon's upbringing and personal history, beginning with his father having
murdered his mother when he was one year old, leading to him and his siblings
be placed into foster care in Alaska initially.  The defendant and two of his
siblings later were later sent to live with his grandmother in Oklahoma.

He grew up poor, with the only financial support in the home coming
from his grandmother's Social Security and public welfare benefits.  The only
"father-figure" in his life was a neighbor.  The defendant was born with a cleft
lip and palate along with vision problems. This caused him to be bullied and he
was socially awkward and isolated.

The defendant has a teenage daughter from his first marriage who he has
sole custody of and raised himself after separating from his first wife.

He has a second daughter, age 8, from his current marriage to his wife
Olga.

Mr. Kenyon had another child from his second marriage, born in 2002 –
Jaylen.  But Jaylen was born with serious health problems that were related to
a genetic condition inherited from Mr. Kenyon.  Mr. Kenyon raised her on his
own after separating from her mother following her incarceration for fraud.
But Jaylen eventually succumbed to the conditions from which she suffered,
with Mr. Kenyon having to make the decision to remove her from life support
following multiple surgeries to address her medical problems when she was
only five years old. The surgeries were not anticipated to be life threatening,

and the sequence of events leading to her passing were emotionally devasting

to Mr. Kenyon, as he blamed himself for his daughter's suffering. Somewhere

along this path, Mr. Kenyon turned to alcohol for comfort.

Mr. Kenyon relocated to Stauton, Virginia to attend James Madison

University. Out of his very difficult childhood, with practically no family

support, and through the tragedies of his early adulthood, Mr. Kenyon still

managed to obtain a Master's Degree in Public Administration.

In a story not set forth in detail in the PSR, but which he will relay to the

Court himself, in 2018 Mr. Kenyon nearly drowned in a drunken stupor. He

spent several minutes submerged underwater before being pulled out and life

support measures being taken to resuscitate him. Mr. Kenyon was

hospitalized in a coma. After an extended period of being unconscious, with

the belief that he likely suffered severe brain damage due to the extended

deprivation of oxygen, his family was faced with the decision whether or not to

remove him from life support. One day prior to that decision being made, Mr.

Kenyon woke up from his coma with only minor cognitive impairments. Mr.

Kenyon went through a 30 day in-patient alcohol treatment program, and has

not consumed alcohol since. In the aftermath of this episode he committed

himself to a regimen of physical fitness – which the Court may recall being a

part of the evidence in this case.

Now the Court knows the backstory that brought Mr. Kenyon to this

point in his life, and the changes he made in the aftermath of his near-death

experience in 2018. Up until events of January 6, 2021, Mr. Kenyon was

hoping to find employment in the public sector at the municipal government

level using his education in public administration – something that was frustrated by the COVID 19 pandemic in early 2020. Those expectations have been on hold pending the resolution of this case.

> 2.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

Among the considerations required by Sec. 3553(a) is that the Court seek to avoid unwarranted sentencing disparities. Here the defendant had four co-defendants. In addition, there are numerous other individuals who have been convicted of violations of Sections 111(a) and 231 on substantially similar facts.

Given the hundreds of cases already resolved by the Judges in this District, there are several examples where the lead count of conviction is a violation of Sec. 231. There are a handful of cases involving convictions of both Sec. 231 and Sec. 111(a) where the offense conduct was not so egregious as to constitute an "assault," but some lesser measure of engagement with the law enforcement officers that met the statutory elements of impeding, interfering, etc., such that both Sections 231 and 111(a) were violated.

One such example is *United States v. Mehaffie*, 21-cr-00040 (TNM). Mehaffie was convicted at trial in connection with events inside the Lower West Terrace tunnel, but with an express finding by Judge McFadden in his verdict that Mehaffie had not "assaulted" any officer, but that some of his conduct was

nevertheless still in violation of Sections 111(a) and 231.  Mr. Mehaffie was sentenced to 14 months.

This Court recently sentenced defendant Gabriel Garcia to 12 months in custody under similar circumstances, with Mr. Garcia having been convicted of both a violation of Sec. 1512(c)(2) and Sec. 231 in a stipulated bench trial.

As noted above, Mr. Kenyon's decision to go to trial here was driven in large part by the fact that the only plea offer extended to him was for the Sec. 1512(c)(2) count.  Just as Mr. Garcia was unwilling to plead "guilty" to the Sec. 1512(c)(2) count – opting for a stipulated bench trial instead – Mr. Kenyon opted for a trial for the same reason, and now faces sentencing only on the Sec. 231 count and four misdemeanors.

In *United States v. Brackley*, 24-cr-0009 (CJN) – like *Mehaffie* -- the Court sentenced the defendant to 15 months on violations of both Sec. 111(a) and Sec. 231 where the offense conduct was less egregious.  *Brackley* crossed numerous barriers and police lines on his way to entering the Capitol, and once inside he went to multiple locations before being stopped by two officers as he approached the Senate Chambers.  He then led other protesters in pushing through the officers attempting to block their path, using his arms and elbows to get past them.

In *United States v. Daniel Johnson*,  21-cr-00407 (DLF), the defendant engaged in arguably more egregious offense conduct, but was sentenced to only 4 months in custody following a guilty plea to a Sec. 231 count.  Johnson and his son (below) climbed through the broken Senate Wing Door windows, and were inside the Capitol for approximately 25 minutes.

While inside they went to numerous locations and chanted along with the crowd. They went to the third floor – similar to Mr. Kenyon -- and attempted to enter rooms only to find the doors locked. Back on the second floor, when the Columbus doors which were still closed, they participated with others in the foyer to push aside the Capitol Police officers guarding the doors so they could be opened in order to let the crowd on the east side into the building. From the Government's sentencing statement, ECF Doc. No. 58:

> After watching the scene, the Johnsons joined a group of other rioters and charged at the line of officers. They helped push through the officers and push open the East Rotunda doors, allowing rioters outside of the building to enter.

The only significant factual difference is that Johnson did not have actual physical contact with any officers so his Adjusted Offense level was only 10, without a +3 level enhancement. The Government asked for six months incarceration, but the Court imposed only 4 months. In the same case, Daryl Johnson, was sentenced to only 30 days in custody.

In *United States v. Hamner*, 21-cr-00689-ABJ, the defendant faced much more serious charges, including a violation of 18 U.S.C. Sec. 111(b). The defendant pled guilty without an agreement to a violation of Sec. 231, while the remaining counts were left pending. The defendant was detained in custody while his case was pending. The Court eventually sentenced the defendant to 30 months in custody – which he had already served by the date of his sentencing -- and in consideration thereof the Government moved to dismiss the remaining counts. This is the only case defense counsel is aware of in which the Government has dismissed a Sec. 111(b) charge after a guilty plea to

a Sec. 231 count.  The defendant also had an extensive criminal history in Colorado, including convictions for assault resisting/obstructing officers.

DEFENDANT'S SENTENCING RECOMMENDATION

With a Total Offense Level of 11, the recommended Guideline Range of 8-14 months, is in Zone B of the Sentencing Table.  Therefore, the Court has the discretion to impose a sentence of Probation, if a condition of probation is that a portion of the term of probation is served under conditions of community confinement.  Based thereon, Defendant Jay Kenyon recommends a sentence of 24 months of probation, with a term of his probation being that he serve 8 months under home confinement, as an appropriate sentence in his case. Alternatively, taking into consideration the most serious offense of conviction, and the _relatively_ innocuous nature of the offense conduct, if the Court determines that some term of incarceration is necessary, Defendant Kenyon suggests that a term of 4 months in custody is sufficient to address all the factors set forth in Sec. 3553(a).

Date: January 6, 2025                  Respectfully Submitted,

/s/ William L. Shipley
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

_Attorney for Defendant_